UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X

CESARI S.R.L.,

                      Plaintiff,

                  - against -

PEJU PROVINCE WINERY L.P., PEJU FAMILY
OPERATING PARTNERSHIP L.P., and PEJU
PROVINCE CORPORATION,
                      Defendants.

---------------------------------------X

**OPINION AND ORDER**

17 Civ. 873 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


In 2017, plaintiff Cesari S.r.l. ("plaintiff" or "Cesari"),
an Italian winery based in San Pietro that produces wine bearing
the mark "LIANO," brought this trademark infringement action
against defendants Peju Province Winery L.P. ("PPW"), Peju Family
Operating Partnership L.P. ("PFOP"), and Peju Province Corporation
("Peju Corporation") (collectively, "Peju"), a family-operated
winery in Northern California that has produced wines branded
"LIANA." After the Court granted plaintiff's unopposed
application to dismiss Peju Corporation from this action and
resolved the issue of liability in favor of plaintiff, the Court
held a bench trial on the sole remaining issue of disgorgement of
profits from PPW and PFOP (collectively, "defendants"). This
opinion constitutes the Court's findings of fact and conclusions
of law.

Having considered all of the evidence, the Court concludes that plaintiff is entitled to profits in the amount of **$666,214** plus interest.   In so holding, the Court makes the following factual determinations, discussed at length below: (1) defendants earned **$1,070,879** in revenues from the sale of infringing wines; (2) defendants incurred costs of **$404,665 (including excise taxes)** related to these sales; and (3) an equitable adjustment is unnecessary.

## PROCEDURAL HISTORY

### A. Initial Pleadings

On February 6, 2017, plaintiff filed its initial complaint and asserted five causes of action: (1) federal trademark infringement under 15 U.S.C. §§ 1114, 1117; (2) federal unfair competition under 15 U.S.C. § 1125(a); (3) common law trademark infringement; (4) common law unfair competition; and (5) cyber-squatting under 15 U.S.C. § 1125(d).   See ECF No. 1 ("Compl."). For relief, plaintiff sought a declaratory judgment, a permanent injunction, disgorgement of profits, damages, and attorneys' fees and costs.

The crux of plaintiff's complaint is that Peju's sales of its "LIANA" branded wines infringed upon plaintiff's "LIANO" mark, which was federally registered with the United States Patent and Trademark Office ("USPTO") for wines in International Class 33 on

January 7, 2003.  See ECF Nos. 1-1; 15 ("Answer") ¶ 3[1]; 42 at 1.

Around the time that plaintiff obtained its mark, Peju began

promoting its wine dubbed "LIANA."  See ECF No. 372 at 1.  Indeed,

in February 2003, PPW filed its own application with the USPTO to

register "LIANA," which was opposed by plaintiff and ultimately

rejected by the Trademark Trial and Appeal Board ("TTAB") of the

USPTO on July 20, 2004 on the grounds that Peju's "LIANA" mark was

confusingly similar to plaintiff's registered "LIANO" mark.  See

id. at 2; ECF No. 1-2 at 2.

        Rather than appealing the TTAB decision, or even filing a new

application to register "LIANA" for narrower usages, PPW simply

continued using the "LIANA" mark until 2007, after which the mark

lay dormant until 2014.  See ECF Nos. 42 at 4; 372 at 2; Answer

¶ 36.  Beginning in 2014, Peju sought to resurrect the LIANA brand.

See ECF No. 372 at 2.  The following year, Peju "founded an entirely

new winery, Liana Estates" and began "promot[ing] [its] wines under

the LIANA ESTATES label."  ECF Nos. 42 at 4; 372 at 2, 5; Answer

¶ 36.  Allegedly unaware of its affiliate's prior attempt, in March

2016, PFOP also "submitted a new application with the USPTO to

register LIANA, this time for all alcoholic beverages except for

beer."  ECF No. 42 at 4-5.  In response, plaintiff sent Peju a

---

[1] In its answer to plaintiff's original complaint, Peju admitted that "Cesari
is the listed owner of a U.S. trademark registration for the LIANO mark for
wines, and that Cesari filed a declaration of incontestability under Section 15
in support of the registration."  Answer ¶ 3; see also id. ¶¶ 19, 20.

cease-and-desist letter, and attempted to negotiate a resolution. <u>See</u> Compl. ¶ 42; Answer ¶ 42, ECF No. 372 at 11.[2]   After negotiations failed, on January 30, 2017, plaintiff, once again, commenced opposition proceedings before the TTAB and, one week later, brought this action.   <u>See</u> ECF No. 372 at 11.

**B. Preclusive Effect of TTAB's Prior Ruling on Likelihood of Confusion as to PPW**

After Peju answered plaintiff's complaint, <u>see</u> Answer, the Court granted plaintiff leave to move for partial summary judgment on the issue of whether Peju is "precluded from relitigating the TTAB's determination that the LIANA mark is likely to cause confusion with Cesari's mark, LIANO."   ECF No. 42 at 6.   In its December 11, 2017 decision on plaintiff's motion, the Court granted in part and denied in part plaintiff's motion for partial summary judgment.   <u>See</u> <u>id.</u> at 3-6.

First, the Court held that issue preclusion should apply, given "the usages adjudicated by the TTAB are materially the same as those before the [Court]."   <u>See</u> <u>id.</u> at 6 (quoting <u>B&B Hardware, Inc. v. Hargis Indus., Inc.</u>, 575 U.S. 138, 160 (2015)).   In doing so, the Court rejected Peju's argument that "their actual marketplace usage of LIANA is materially different from that which

---

[2] "Peju admits that Cesari's trademark counsel sent a cease-and-desist letter to the attorney of record for the LIANA application filed by Defendant Peju Family Operating Partnership, L.P."   Answer ¶ 42.

the TTAB adjudicated,"[3] id. at 8-9, as the TTAB had broadly concluded that plaintiff's mark, LIANA, was likely to cause confusion with Cesari's previously registered mark, "LIANO," given "[t]he sole distinction between the two marks is the last letter," and the parties' goods (i.e., wines in International Class 33) are "identical." Id. at 3; ECF Nos. 1-2 at 2, 4; 437 at 1. Moreover, the Court noted that "[t]he specific trade channels and classes of consumers that purportedly characterize the LIANA mark's usage are among the reasonable trade channels and usual classes of consumers the TTAB considered." ECF No. 42 at 9.

However, the Court also concluded that the record was insufficiently developed to permit the Court to extend the preclusive effect of the TTAB decision rejecting PPW's application to PFOP and Peju Corporation. See id. at 12-15. Thus, "summary judgment with respect to [that] issue [was] denied without prejudice to refiling following further development of the record." Id. at 14.

Following the Court's ruling, Peju represented to this Court that "the only issues remaining in this case are whether Peju Province Corporation and/or Peju Family Operating Partnership, L.P. controlled Peju Province Winery L.P. in the previous TTAB

---

[3] In so holding, the Court rejected defendants' argument that the TTAB failed to consider the differences between defendants' labels, such as one iteration in which "LIANA ESTATES appears only on the back of the wine bottle." See ECF Nos. 29 at 8-10; 437 at 1-2.

5

litigation, whether Peju Province Winery L.P. controls one or both of these entities in the instant litigation, and whether Plaintiff is entitled to any remedies, and, if so, the nature of those remedies." ECF No. 55 at 2.

**C. Peju's Use of the Infringing Mark Until July 2018**

On March 12, 2018, the Court entered a scheduling order governing discovery. See ECF No. 50. Shortly thereafter, on May 10, 2018, plaintiff sought leave to file yet another motion for partial summary judgment, which included a request for injunctive relief because Peju "willfully continue[d] to infringe [upon] Cesari's registered mark, as if this Court's ruling hadn't issued" and had "ignored Cesari's requests that they cease and desist from their willful infringement." ECF No. 53 at 1-2. However, "[o]n June 12, 2018, this Court held a lengthy teleconference with counsel for all parties," during which the Court determined that "plaintiff's request to file a motion for injunctive relief . . . had essentially been mooted by defendants' counsel's representation that defendants would cease using the disputed mark within two weeks." ECF No. 79 at 1.

In letters of June 28, 2018, see ECF No. 75, and July 9, 2018, see ECF No. 78, plaintiff alerted the Court to the fact that Peju had not followed through on their counsel's representations, see ECF No. 79 at 1. As such, on July 10, 2018, the Court gave plaintiff permission to move for a preliminary injunction. See

id. at 2.   As a result, defendants' counsel made another representation to the Court on July 16, 2018 that Peju will completely cease using "LIANA" by July 24, 2018.   See ECF No. 82 at 2 ("[W]e wish to inform Your Honor that LE Wines, formerly Liana Estates, remains in the process of relabeling its wines bearing the LIANA mark. This undertaking, which has been substantial, is expected to be complete by no later than July 24, 2018. Accordingly, we are informed that no sales of wine bearing the LIANA mark will occur after this date."); ECF No. 82-1 (attaching photographs showing removal of "LIANA Estates" from the winery's signage).   Accordingly, plaintiff's motion was no longer necessary and was not made at that time.   See ECF No. 84 (order stating that motion for injunction was no longer "necessary or appropriate").

### D. Amended Pleadings

The parties continued to engage in discovery, which became highly contentious.   See ECF No. 84.   Indeed, during the course of this litigation, the Court has resolved an overwhelming number of discovery disputes, particularly for a case lacking substantial complexity.[4]   See e.g., ECF Nos. 71, 79, 84, 104, 150, 182, 188, 189, 210, 231, 240, 243, 254, 255, 289, 297, 308, 333, 375, 391, 427.   Indeed, the Court has noted that it had "invested such an

---

[4] The Court has provided the parties with an extraordinary amount of assistance in this regard.   For example, during a five-hour conference on plaintiff's motion for sanctions, the Court permitted plaintiff to question defendants' deposition witness, Kandiss Schulz, in Court.   See ECF No. 289.

inordinate amount of time assisting the parties to resolve discovery disputes and move this case" forward, ECF No. 297, against a backdrop where the parties "resorted to filing documents with errors that, quite frankly should not be made," ECF No. 137 at 7.

On November 7, 2018, after plaintiff again sought to extend the preclusive effect of the TTAB decision to PFOP and Peju Corporation through a renewed motion for summary judgment,[5] the Court clarified that the parties should focus their discovery efforts on two areas: the first being "the preclusive effect of the 2004 TTAB proceeding" on PFOP and Peju Corporation; and the second being "the remedies available to plaintiff."  ECF No. 137 at 8.  On the second area, the Court explained:

> If plaintiff cannot extend the TTAB determination to
> Peju Corporation and Peju Partnership, the Court will
> need to determine the likelihood of confusion between
> the LIANO and LIANA marks by analyzing Peju Corporation
> and Peju Partnership's "use in commerce" of the LIANA
> mark and comparing that use to that of Cesari and its
> LIANO mark. See 3 Anne Gilson LaLonde, Gilson on
> Trademarks § 11.08[4][i][iv][C][I] (Matthew Bender ed.);
> see also id. ("Federal courts are focused on what is
> happening in the marketplace rather than in an
> application or registration."). In addition, to recover
> profits, as plaintiff seeks, from any defendant, Cesari
> must prove only the defendants' sales, and defendants
> must prove any costs or deductions from its gross
> revenues. See 15 U.S.C. § 1117(b).

---

[5]  In its November 7, 2018 decision, the Court again declined to extend the preclusive effect of the TTAB decision to these two entities because the factual record continued to be insufficiently supported.  The Court also noted that plaintiff's renewed motion for summary judgment and discovery dispute letters had a "sense of impatience."  ECF No. 137 at 7.

Id. at 8-9.[6]

At a January 17, 2019 conference, plaintiff's counsel informed the Court that discovery from Peju's former accountant had revealed various transactions among PPW, PFOP, and Peju Corporation, including a transfer of PPW's assets to PFOP, thereby supporting plaintiff's argument that the preclusive effect of the TTAB decision should be extended to PFOP and Peju Corporation. See ECF No. 150 at 50:12-14.  Plaintiff's counsel also stated that it decided to "not pursue a theory of lost profits," see id. at 3:20-22; see also id. at 4:4-5 ("[W]e focused our entire discovery on the disgorgement of profits."), and notified the Court that it

---

[6] Years later, Peju argued that plaintiff could not prove trademark infringement, even with respect to PPW, unless plaintiff established that it has a valid mark entitled to protection and that defendants used the same or similar mark in commerce.  See ECF Nos. 248; cf. ECF No. 431 (raising same argument).  In its December 10, 2020 opinion, this Court rejected defendants' argument, explaining:

> TTAB previously held in its summary judgment ruling that '[t]here is no genuine issue of fact [that] . . . the registration [of the LIANO mark] is subsisting and is owned by [Cesari],' a conclusion that necessarily involved a finding that the mark was used by Cesari in commerce.

ECF No. 255 at 6-7; see also ECF No. 437.

The Court further noted that "regardless of the preclusive effect of the TTAB's judgment as to specific defendants, that Cesari owns a valid registered trademark in LIANO is an established fact, which the Court observes has never previously been challenged in this litigation."  ECF No. 255 at 7.  Consistent with the Court's guidance on November 7, 2018, however, the Court permitted defendants to explore the "use of commerce" issue in its 30(b)(6) deposition "at a basic level," while acknowledging "if plaintiff's non-use of the trademark were truly a defense in this nearly four-year-old case, it would have been raised and pursued years ago."  Id.  After the Court ruled that the preclusive effect of the TTAB decision could be extended, this area of inquiry was no longer relevant.  Accord ECF No. 375 at 4:5-9 (transcript from September 25, 2022 conference in which the Court stated that the issue of liability has been resolved, and neither party disagreed or objected).

was withdrawing its request for permanent injunctive relief because Peju had represented that they had ceased using the LIANA mark, see ECF No. 191 at 4. Plaintiff accordingly requested permission to move to amend its complaint. See ECF No. 150 at 53:16-18.

Three years after the filing of the initial complaint and after a full briefing, on February 24, 2020, the Court granted plaintiff's motion for leave to amend its complaint to incorporate facts obtained during discovery to support a finding that PFOP and Peju Corporation could be held indirectly liable for PPW's infringement through means other than collateral estoppel. See ECF No. 191 at 15. On March 2, 2020, plaintiff filed its amended complaint, which made these additions and omitted plaintiff's cyber-squatting claim[7] and requests for injunctive relief and damages, thereby concentrating on obtaining disgorgement of profits. See ECF No. 197 ("Am. Compl.").

As a result of these amendments, on April 30, 2020, the Court instructed the parties to "focus[] on the discovery" and "these sales and cost records." See ECF No. 210 at 43:8-10. Peju filed

---

[7] Plaintiff consolidated its remaining claims into two causes of action: (1) federal trademark infringement and unfair competition under 15 U.S.C. §§ 1114, 1125(a), 1117; and (2) New York trademark infringement and unfair competition. See Am. Compl.

an answer to the amended complaint on May 14, 2020.[8]   See ECF
No. 213.

### E. Dismissal of Peju Corporation

On September 5, 2021, in a joint letter, the parties informed
the Court that they "have agreed that Cesari will drop Peju
Province Corporation as a party defendant" and thus requested that
the Court drop Peju Corporation as a party pursuant to Federal
Rule of Civil Procedure 21.   See ECF No. 298 at 4.   On October 5,
2021, the Court granted the application, dismissing Peju
Corporation, the general partner of PPW and PFOP, from the action.
See ECF No. 299; cf. ECF Nos. 58 at 3; 372 at 1 n.1.

### F. Extension of Preclusive Effect of TTAB Decision to PFOP and Finding of Bad Faith

After additional years of combative litigation, the parties
filed another round of summary judgment motions.   See ECF No. 372
at 3.   Defendants sought dismissal of all of plaintiff's claims as
untimely under the applicable statute of limitations and the
equitable doctrine of laches, while plaintiff, once again, sought
dismissal of defendants' same affirmative defenses and renewed its

---

[8] Before filing an answer, defendants sought leave to file a motion to dismiss
on the grounds that "plaintiff's claims are barred by the statute of
limitations, and by laches and acquiescence."   See ECF No. 198 at 2.   The Court
held a pre-motion conference on April 30, 2018 to address defendants' request,
during which it instructed defendants to raise their arguments in a motion for
summary judgment, rather than a motion to dismiss, given that defendants
acknowledged that they would need to go outside the record to substantiate their
arguments.   See ECF Nos. 210 at 3:6-14; 255 at 3-4.

motion for partial summary judgment to extend the preclusive effect of the TTAB decision to PFOP.[9]  See id. at 3-4.

On August 3, 2022, the Court granted plaintiff's motion to extend the preclusive effect of the TTAB decision to PFOP, after defendants conceded, five years into the litigation, that PPW and PFOP "are effectively one and the same entity because, inter alia, they share common ownership and control."  Id. at 17.  The Court also dismissed defendants' affirmative defenses with prejudice. See id. at 13-43.  On defendants' statute of limitations argument, the Court reasoned, in part, that the claims asserted in the amended complaint arise from defendants' conduct since 2014, which is within New York's six-year statutory period.  See id. at 24, 33-35.  With respect to defendants' laches defense, the Court held, in part, that defendants could not even satisfy the threshold requirement that the party invoking laches come to court with clean hands.  See id. at 36.  The Court explained:

> Peju did not use the LIANA mark in good faith. As
> discussed above, between 2005 and 2007, Peju continued
> to use the LIANA mark despite actual knowledge of
> Cesari's first-in-time registered trademark, Cesari's
> opposition to Peju's use of the LIANA mark, and the
> TTAB's ruling that Peju's mark was likely to cause
> confusion with Cesari's mark. Although the TTAB's ruling
> may not have legally enjoined Peju from using the LIANA
> mark, Peju dirtied its hands when it flouted the legal

---

[9] As the Court explained in its August 3, 2022 decision, the preclusive effect of the TTAB decision to PFOB could not be made during plaintiff's previous summary judgment motions because "plaintiff had failed to establish, based on the record before the Court, the requisite relationship" among the entities. Id. at 4 n.4.

12

conclusion of a judicial authority and disregarded its
duty as a second comer "to avoid all likelihood of
consumers confusing it with the product of the first
comer." Nikon, Inc. v. Ikon Corp., 803 F. Supp. 910,
922 (S.D.N.Y. 1992); see Thursday LLC v. NVB, Inc., No.
20 Civ. 9142 (AKH), 2021 WL 2689061, at *5 (S.D.N.Y.
June 29, 2021) (concluding plaintiff sufficiently stated
claim for unfair competition under New York law, which
required showing of bad faith or intent, where plaintiff
alleged, inter alia, defendant "began using the marks
despite the USPTO's refusal to register their mark due
to the likelihood of confusion with the [plaintiff's]
Marks").

With respect to Peju's second attempt to register the
LIANA mark, Peju again acted in bad faith.  Even assuming
the Peju daughters were unaware of the original dispute
with Cesari when they sought to resurrect the LIANA brand
in 2014, Peju was put on notice of Cesari's registered
mark and opposition in August 2016, when Cesari filed a
request for an extension of time to oppose the 2016
Application. See Ariana Peju Decl., Ex. E. Cesari then
sent Peju a cease-and-desist letter in November 2016.
Id., Ex. F. In January 2017, Cesari apprised Peju of the
TTAB's prior determination that the LIANA mark was
likely to cause confusion with Cesari's mark. Id., Ex.
I. Peju nevertheless continued to use the LIANA mark. It
wasn't until July 2018 — one and a half years after this
action was commenced — that Peju finally terminated its
use of the LIANA brand. See July 16, 2018 Letter, ECF
No. 82.

In their reply, defendants argue, without citing to any
authority from the Second Circuit, that the unclean
hands doctrine requires a showing of fraudulent intent
and that no such showing has been made here.  Mem. of
Law of Peju Province Winery L.P. and Peju Family
Operating Partnership L.P. in Further Support of their
Mot. for Summary Judgment ("Def. Reply Br.") at 7, ECF
No. 362. To the contrary, "[a]ny willful act concerning
the cause of action which rightfully can be said to
transgress equitable standards of conduct is
sufficient." Precision Instrument Mfg. Co., 324 U.S. at
815. Further, although "prior knowledge of a senior
user's mark does not in itself imply bad faith . . .
actual or constructive knowledge may signal bad faith."
Nikon, 803 F. Supp. at 924.  In more ways than one, the

foreground demonstrates that Peju does not "possess a right which is firmly planted in good faith." Id. Peju "took a calculated risk in utilizing [the] mark and the aid of a court of equity should not be invoked on behalf of one who lost such a gamble." Fusco Group, Inc. v. Loss Consultants Int'l, Inc., 462 F. Supp. 2d 321, 330 (N.D.N.Y. 2006) (internal quotation marks and citation omitted).

Id. at 37-39.

Finally, the Court's decision of August 3, 2022 "resolve[d] the issue of liability." ECF No. 375 at 4:8; see also Reply All Corp. v. Gimlet Media, LLC, 843 F. App'x 392, 395 (2d Cir. 2021); The Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 960 (2d Cir. 1996). Thus, the sole issue remaining in this litigation was the disgorgement of defendants' profits. See ECF Nos. 391, 440-4 at 13.

**G. Preparation for Trial on Disgorgement of Profits**

Following the Court's August 3, 2022 decision, plaintiff sought to reopen discovery with demands on defendants that spanned 88 pages and contained 553 numbered paragraphs plus an additional three pages titled "Document Request List." ECF No. 391; see also ECF Nos. 382-390. On January 3, 2023 the Court granted defendants' application for a protective order striking these demands and set a trial date of July 10, 2023. See ECF No. 391 at 2.[10] In advance

---

[10] However, the Court further directed: "[t]o the extent that defendants have failed to produce specific sales records created in the ordinary course of business that were requested by plaintiff during fact discovery, defendants are instructed to produce such records by January 13, 2023." ECF No. 391. As such, certain remaining sales records were produced by defendants in January 2023.

of the bench trial, the Court directed plaintiff to "serve by February 10, 2023 an expert report on the single issue of defendants' sales, on which it bears the burden of proof"; defendants to "serve by March 13, 2023 an expert report on all elements of costs or deductions claimed, on which they bear the burden of proof," which "may also challenge plaintiff's sales figures"; and plaintiff to, "if it wishes to do so, serve a rebuttal expert report limited to the elements of costs and deductions claimed by defendants by April 14, 2023." Id. The January 3, 2023 Order also directed that the parties shall make the "data upon which each party's expert(s) rely . . . available to the other party prior to the depositions of the experts, which will be concluded by May 15, 2023"; and to submit to the Court proposed findings of fact and conclusions of law and any pretrial memoranda no later than June 15, 2023. Id.[11]

---

[11] On February 6, 2023, the Court denied defendants' application for leave to file an expert report to pursue an advice of counsel defense, which defendants argued "goes to the issue of willfulness which, in turn, may be relevant in mitigating the amount of damages awarded to plaintiff." ECF No. 397 at 2; see also ECF No. 406. The Court reasoned that "defendants cite no case authority in this Circuit permitting an advice of counsel defense to reduce profits at the disgorgement phase of a trademark case" and that "the issue of good faith has already been resolved in the context of defendants' own motion for summary judgment." ECF No. 406 at 3-4. On June 14, 2023, the Court also denied defendants' request for a Daubert hearing, given that "Daubert has a very limited role in the non-jury context" and given that "plaintiff's expert is a forensic accountant whose testimony is derived from documents provided by defendants." See ECF No. 438 at 1.

**LEGAL STANDARD**

Before moving to this Court's findings, we first provide the legal context for the trial, namely, the calculation of an infringer's profits under the Lanham Act.

**A. Remedies Under the Lanham Act**

Once a violation of the Lanham Act is established, the plaintiff is entitled:

> subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

As noted, plaintiff is only seeking disgorgement of defendants' profits. <u>See</u> Am. Compl. at 31-32; ECF No. 150 at 3:20-4:5. In <u>Romag Fasteners, Inc v. Fossil, Inc.</u>, the Supreme Court clarified that a "showing of willfulness" is not a "precondition"

to awarding profits in trademark cases.  140 S. Ct. 1492, 1496-97 (2020).  Nevertheless, "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate," id. at 1497, as an "award of profits for innocent or good-faith trademark infringement would not be consonant with the 'principles of equity' referenced in § 1117(a)," id. at 1498 (Sotomayer, J., concurring).  Here, however, the issue of good faith has already been resolved in the context of defendants' own motion for summary judgment, as noted supra at 12-14.  See ECF No. 372 at 37-39.  Moreover, even if that issue had not been resolved, willfulness has clearly been established here, based on the same facts described in the Court's August 3, 2022 decision.  See id.  Accordingly, an award of profits is appropriate.

**B. Sales**

When an award of profits is appropriate, the plaintiff need only prove the defendant's sales, and the defendant bears the burden of proving appropriate costs or deductions.  See 15 U.S.C. § 1117(a); ECF Nos. 137 at 8-9; 391 at 1; Am. Honda Motor Co. v. Two Wheel Corp., 918 F.2d 1060, 1063 (2d Cir. 1990); Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp. 2d 436, 459 (S.D.N.Y. 2012), aff'd, 760 F.3d 247 (2d Cir. 2014).  The law places the initial burden on a plaintiff to prove sales, despite the fact that sales

information typically can be obtained only through discovery from the infringer.  See 5 McCarthy on Trademarks § 30:66 (5th ed.).

**C. Costs**

Under the Lanham Act, while the plaintiff has the burden to prove sales, the burden falls on the defendant to establish costs. 15 U.S.C. § 1117(a).  "Ordinarily, a plaintiff that has proved the amount of infringing sales would be entitled to that amount unless the defendant adequately proved the amount of costs to be deducted from it."  Am. Honda Motor Co., 918 F.2d at 1063.

The Circuits vary on what costs can be deducted, but this Circuit applies the "full absorption" approach.  Warner Bros., Inc. v. Gay Toys, Inc., 598 F. Supp. 424, 428 (S.D.N.Y. 1984). This approach permits the deduction of direct costs to produce the infringing goods, as well as certain fixed costs, like overhead. Id.  In order to deduct specific costs, the infringer "must prove not only that it has borne the particular cost or expense but also that the cost or expense is attributable to its unlawful sales." Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 7 (2d Cir. 1989).

For overhead costs, courts use a two-step analysis:

The court must first "determine what overhead categories . . . are actually implicated by the production of the infringing product," a process that requires a determination whether there is a "sufficient nexus between a category of overhead and the production or sale of the infringing product." . . . The second step

18

> is to determine "a fair, accurate, and practical method of allocating the implicated overhead to the infringement." The infringer has the burden of offering such a formula, which the court is to assess for reasonableness, a determination that requires a case-by-case factual assessment.

Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 642 F. Supp. 2d 276, 290 (S.D.N.Y. 2009) (quoting Hamil Am. Inc. v. GFI, 193 F.3d 92, 105 (2d Cir.1999)) (first alteration in original). Moreover, "[w]hen infringement is found to be willful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product." Hamil, 193 F.3d at 107.

That being said, disgorgement of profits remains an equitable remedy. Thus, "even where the infringer failed to produce evidence of either apportionment or cost deductions, to avoid a windfall to the mark owner, the court may award its own estimate of what is a fair recovery." 5 McCarthy on Trademark § 30.66 (5th ed.).

D. **Equitable Adjustment**

Finally, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive," the court may make an equitable adjustment. 15 U.S.C. § 1117(a). In doing so, the Court can consider, for example: "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role

19

of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands." <u>4 Pillar Dynasty LLC v. New York & Co., Inc.</u>, 933 F.3d 202, 214 (2d Cir. 2019). Ultimately, the Court should consider whether the "disgorgement of all profits attributable to the infringing product is necessary to achieve the desired deterrent effect." <u>Id.</u>

**DISCUSSION**

The trial began on July 10, 2023 and concluded on July 13, 2023, producing 702 pages of transcript.[12]  During the course of the trial, the Court heard testimony from the Vice President of Finance at PPW, Kandiss Schulz ("Ms. Schulz"); and President of PPW, Oren Lewin ("Mr. Lewin").[13]  The Court also heard expert testimony from each side.  Plaintiff called Beth Rubin ("Ms. Rubin"), who is the Managing Director in the Forensic and Litigation Consulting practice at FTI Consulting, Inc. and is a certified public accountant ("CPA").  <u>See</u> PX-01/DX-02.  Defendants called Mr. David Duski ("Mr. Duski"), who is a Principal at Charles River Associates and had previously provided financial consulting

---

[12] "Trial Tr. _" refers to the trial transcripts, <u>see</u> ECF Nos. 461, 463, 465, 467.

[13] The Court permitted Mr. Lewin to testify remotely without objection.  <u>See</u> ECF No. 453 at 2.

services in connection with several commercial disputes.  <u>See</u> DX-03.  He is also a CPA.  <u>Id.</u>

In advance of the trial the parties stipulated to 37 exhibits. <u>See</u> ECF No. 457.  In addition, the Court received as direct testimony five declarations of Ms. Schulz, <u>see</u> DX-49, DX-50, DX-53, DX-54, DX-56; the declaration of Mr. Lewin, <u>see</u> DX-52; and the reports of the experts, <u>see</u> PX-01/DX-02, DX-03, PX-02/DX.[14]  The Court then admitted an additional 53 exhibits during trial.[15]

After the conclusion of the trial, the parties filed annotated findings of fact and conclusions of law on July 28, 2023.  <u>See</u> ECF No. 469-71.

The Court makes the following findings and conclusions based on the exhibits stipulated to prior to trial, the sworn declarations and expert reports that were proffered as the witnesses' direct testimony, the testimony during the trial, and exhibits admitted at trial.

---

[14] PX-_ refers to plaintiff's exhibits and DX-_ refers to defendants' exhibits. If a document was marked as both a plaintiff exhibit and defendants exhibit, the Court refers to both markings when citing the exhibits.

[15] There was some confusion during trial regarding the admission of exhibits to the declarations of the defense witnesses, particularly the declarations of Ms. Schulz.  As a result, defense counsel identified and moved these documents into evidence as exhibits to the underlying declaration (<u>e.g.</u>, Ex K to DX-49), even though defendants had separately identified some of these documents as standalone exhibits in their pretrial exhibit list (<u>e.g.</u>, DX-13, <u>see</u> ECF No. 457).  Thus, for clarity and completeness, if a document was identified as both an attachment to an admitted declaration and as a separate exhibit, the Court provides both references in its opinion.

Further, to the extent that the Court refers to any evidence to which a party objected, the objection is overruled.

### A. Background

#### 1. Operation of the Business

The trial on damages provided the Court with clarity on defendants' business operations for the first time in this seven-year litigation.  Defendants own and run a family winery, through which they produce, market, and sell wines under two brands relevant to this litigation –- the Peju brand and the Liana Estates brand.[16]  See Trial Tr. at 224:25-225:19.  At the outset, defendants operated a single winery founded in 1982 known as Peju Province Winery at 8466 Saint Helena Highway, Rutherford, California, which sold Peju-branded wines ("Peju Winery").  Id. at 225:25-226:7.  The operations of the company originally fell under PPW, but, in 2012, a corporate restructuring transferred the operations of the Peju Province Winery to the corporate operating company, PFOP.  Id. at 331:4-332:18.

A few years later, in 2016, defendants acquired a second winery, known as Liana Estates Winery at 2750 Las Amigas Road, Napa, California.  Id. at 226:4-7, 320:21-23, 342:5-12.  From that winery, which opened to the public in October 2016, defendants launched the LIANA brand.  Id. at 471:8-11.  Although the Liana Estates Winery was a separate property, it was operated by the same corporate operating partnership, PFOP.  Id. at 225:9-19.  As

---

[16] It is the Court's understanding that there may be other wine brands, but those other brands are not the subject of this litigation.

a result, for tax purposes, costs and revenues for the two properties were combined and reported under PFOP.  Id.  However, for operational purposes, defendants maintained separate records for each winery, which are discussed in detail below.  Id.

To produce the Peju and Liana Estates branded wines, defendants either grew grapes at their own vineyards, namely Tess Winery and Persephone, or purchased grapes, known as bulk wine, from other vineyards.  Trial Tr. at 240:8-22, 246:9-247:15.  The farmed grapes were harvested, crushed, and fermented in tanks, while the bulk wine was delivered to defendants already crushed.  Id. at 246:15-247:14.  At that point, both types of wine were further processed at the wineries and blended before being bottled and stored.  Id.

Once produced, the wines were sold at tasting rooms[17] within the two wineries, as well as through online sales, wholesale, and through its wine club.  See id. at 252:2-11.  Throughout the course of the trial, the Court heard evidence regarding how these wineries operated, especially at the Liana Estates Winery.  The wineries provided a chance for customers to sample the wines by purchasing tastings, individual glasses, or bottles.  Id. at 322:8-323:1.

---

[17] The tasting room is contained within the winery, and can be thought of as a register.  See id. at 207:25-208:13.  The witnesses and parties often used "tasting room" and "winery" interchangeably to refer to the physical locations in Napa and Rutherford, California.  For simplicity, the Court refers to each location as a "winery," unless otherwise noted.

Customers could also drink the wines at events held at the wineries. Id. at 321:4-9, 322:8-323:1.

### 2. Records Maintained

In operating their business in the normal course, defendants maintain their records in a system called "Advanced Management Systems" or "AMS." Id. at 201:8-10; DX-49 ¶ 5. This is a suite of software that includes 25 modules designed for wineries, including ones for vineyard management, winemaking, bottling supplies, general inventory, order processing, sales analysis, purchasing, accounts receivable, tasting room cash register, and general ledgers. DX-49 ¶ 5. The system helps maintain records that are needed for reporting to the Alcohol and Tobacco Tax and Trade Bureau. Id. ¶ 6. Information is recorded and stored in this system and then queries are run to generate specific reports or cuts of the data. Id. ¶ 10. When a report is generated in this way, the set-up sheet that precedes the report indicates the specific inputs used to run the query. See id. ¶ 16.

Defendants record information within the system for individual wines. Each wine is assigned a 5-digit part or SKU number, with the first two digits representing the year and the next three digits indicating the varietal. See Trial Tr. at 210:10-18. The system then tracks sales for each wine. Because it is a point-of-sale system, when a sale is made online or at a tasting room, it is immediately and automatically logged in the

24

system.  DX-49 ¶ 9.  Similarly, wholesale wine sales are entered into the system after receipt of the purchase order.  Id.

In addition to sales, AMS contains data on bottling and inventory.  See Trial Tr. at 202:8-17, 250:9-14.  For example, the trial record contains the inventory report for SKUs 13450 and 14450 as of November 30, 2018, showing the number of bottles stored in inventory on that date.  See PX-3; PX-4/DX-9.

Finally, within AMS, defendants also maintain information regarding the costs to produce and sell the wines, and the costs to operate the tasting rooms.  To do so, invoices or receipts are logged into the system and assigned to a cost center.  Trial Tr. at 252:12-253:8.  From there, AMS is used to generate profit and loss statements ("P&L Statements").  These are run on a monthly basis for each winery, see DX-3 at 51, and can either be generated with or without production costs.  When the P&L Statements are labeled "No Production," it means that only the costs to produce the wines that were sold in that year were included.  Id.

## B. Calculation of Sales Revenues

Prior to trial, plaintiff and defendants prepared expert reports which calculated infringing sales at $5,406,330[18] and $1,819,612, respectively.  PX-01/DX-02 at 3; DX-03 at 41.  The large difference in their calculations is attributable to four

---

[18] In Ms. Rubin's rebuttal report, she reduced the total gross sales to $4,560,629 after deducting discounts.  See PX-02/DX-04.

main disputes:  (1) which specific wines should be included in revenue calculations; (2) whether the sales records are incomplete and plaintiff should be able to recover for "unaccounted for" bottles; (3) whether sales after July 2018 should be considered infringing sales; and (4) whether the revenues from tasting fees or event fees are recoverable.  We address each in turn.

### 1. Relevant SKUs

As noted, the Court has already determined that the wines that included "LIANA" on the front or back of the bottle were infringing.  Accordingly, the Court finds that the Peju Late Harvest Orange Muscats (SKUs 13450, 14450, and 15450), which contained the word "LIANA" on the front of the label, below the Peju logo, were infringing ("Peju Branded Infringing Wines"), see DX-52 ¶ 8, as were the vast majority of the wines sold at the Liana Estates Winery, which did not contain a winery name on the front of the label, but contained "LIANA Estates" on the top of the back label ("Liana Estates Branded Infringing Wines").  Given the Court's prior holdings, the parties' experts calculated revenues for all of these wines.

The core dispute between the parties with respect to the scope of infringing wine is whether sparkling wines sold by defendants were infringing.  Plaintiff argues that three sparkling wines are infringing because, during her deposition, Ariana Peju ("Ms. Peju") was shown a list of wines prepared by plaintiff's counsel

and Ms. Peju did not strike the sparkling wines from the list at that time and never retracted her testimony.  Pl. Proposed Findings of Fact ¶ 61, ECF No. 471; PX-50-1.[19]

From the evidence presented at trial, however, the Court finds that the sparkling wines identified by plaintiff did not include the word "LIANA" on the bottle and thus were not infringing.  <u>See</u> Trial Tr. at 481:8-14.  Ms. Schulz noted that defendants did not bottle sparkling wine or possess a license to do so.  <u>See</u> DX-54 at 8.  While Ms. Peju may have been shown the list that plaintiff relies upon, subsequent testimony of Ms. Schulz clarified that the bottles of sparkling wine bottled by a third-party vendor, who labeled the sparkling bottles as either Peju or Carneros, not Liana.  DX-54 at 8.  We credit Ms. Schulz's testimony.

With this in mind, the Court does not award revenues for the sparkling wines.  Appendix A lists all of the infringing wines ("Infringing Wines") and their assigned SKUs.

## 2. Sufficiency of Sales Records and Unaccounted for Bottles

The largest driver of the difference in the revenue calculations of Ms. Rubin and Mr. Duski, is that Ms. Rubin challenged the completeness of sales records maintained by

---

[19] The list admitted into evidence as PX-50-1 is a list of 16 "Liana Wines Currently Known to Plaintiff" at the time of Ms. Peju's deposition.  During the deposition, Ms. Peju crossed out some of the wines, but did not cross out the sparkling wines listed.

defendants in the AMS system.  See PX-01/DX-02.  Plaintiff argues that because "defendant does not competently account for infringing products that the defendant produced or acquired," it can seek revenues from every bottle that was ever produced.  Pl. Proposed Findings of Fact ¶ 42.  On the other hand, Mr. Duski only calculated revenues for the sales documented in the AMS Sales Reports.  See DX-03.

Testimony at trial established how sales of the Infringing Wines occurred and how they were recorded.  Bottles of Infringing Wines were sold at the two physical wineries, through online and phone sales, through the wine club, and through wholesalers.  See Trial Tr. at 252:2-11.  In addition, Ms. Schulz testified that some of the wines were available by the glass at the Liana Estates Winery.  Id. at 324:2-9.

All of these sales were recorded in the AMS system.  See Trial Tr. at 252:2-11.  The Court understands that PX-16/DX-25 and DX-33 represent all bottle sales for the Peju Branded Infringing Wines.[20]  Similarly, PX-10/DX-18, PX-12/DX-20, PX-14, DX-22, and DX-29 (collectively, "AMS Sales Reports" or "Sales Reports") include all sales for the Liana Estates Branded Infringing wines.

---

[20] PX-16/DX-25 and DX-33 show the same information, but PX-16 includes a longer time period and includes SKU 15450PP, which is discussed in more detail in the following section.

Additionally, for clarity of the record, the Court notes that defendants attempted to admit PX-16 as Exhibit B to DX-53.

Occasionally, discounts were offered on the wines for employees or members of the wine club, see DX-3 at 23, which were included in the AMS Sales Reports ("Sales Reports"). Both parties agree that the revenues defendants received were the gross sales net of discounts. Based on the evidence presented as part of trial, the Court has no reason to doubt the accuracy of the Sales Reports, which predate the litigation, were maintained in the regular course of business, and, in particular, were entered automatically at the point-of-sale.[21]

Nevertheless, plaintiff challenges the accuracy and completeness of the Sales Reports because plaintiff claims that the Sales Reports do not align with the number of bottles Ariana Peju previously testified were produced and because there are slight discrepancies between the inventory and sales figures. See Pl. Proposed Findings of Fact ¶ 44.

However, both arguments fail to meaningfully challenge the validity of the Sales Reports. First, the testimony of Ms. Peju was later modified and corrected by Ms. Schulz, who the Court finds has consistently provided credible testimony.[22]   DX-54 ¶¶ 30-39.

---

[21] Plaintiff never raised an argument that the data in AMS was not entered in the normal course of business. We find these records to be admissible evidence under Federal Rule of Evidence 803(6).

[22] Plaintiff claims that defendants are improperly using Ms. Schulz's testimony as a sword and a shield (i.e., seeking to protect documents Ms. Schulz provided Ariana Peju in preparation for a deposition while also affirmatively testifying to correct the evidentiary record). Pl. Proposed Findings of Fact at 19 n. 28. There is no indication that there is a basis for that argument. The Court previously ruled that the compilation of materials prepared by Ms. Schulz for

Second, the discrepancy between inventory and sales numbers is miniscule. For example, plaintiff's expert, Ms. Rubin, highlights that for SKU 14450, defendants' AMS data shows that 6,480 bottles were produced, and, as of 2021, 3,405 bottles remained in inventory. PX-1 at 8-9. The difference between the production and inventory should, in a perfect world, equal sales. Here, the difference between production and inventory is 3,075 bottles, which is 58 bottles more than the number of bottles reflected in the Sales Reports (3,017 bottles). This means that less than one percent of the bottles of SKU 14450 produced were not accounted for by the inventory or sales data.[23] The Court does not find that this is a convincing reason to question the validity of the Sales Reports, let alone entirely disregard them. Ms. Schulz further testified that it is normal for inventory to show small shortages or surpluses. Trial Tr. at 383:2-4.

Moreover, the caselaw plaintiff cites to justify the recovery of revenues for the unaccounted bottles is readily distinguishable. For instance, plaintiff relies on Chesa

---

Ms. Peju to review prior to her deposition were privileged work product. Although those documents prepared by Ms. Schulz were protected by the work product doctrine, there is no evidence that any document in that compilation which was otherwise a business record subject to discovery was independently withheld.

[23] Ms. Rubin performs a similar analysis for SKU 13450. This analysis shows a comparable discrepancy. She acknowledges that 5,892 bottles of the wine were produced and there were 1,112 left in inventory. See PX-1 at 6. However, the sales records only show that 4,699 bottles were sold, leaving a discrepancy of 81 bottles. Id.

International, Ltd. v. Fashion Assocs., Inc., 425 F. Supp. 234 (S.D.N.Y. 1977), in which defendant produced only eleven invoices purporting to show the possible infringing sales and was ultimately sanctioned for its failure to produce relevant documents.  Still, in Chesa, the court did not allow plaintiff to recover for every item produced; instead, the court awarded revenues for all sales reflected in the invoices, even though defendant claimed, without evidence, that some of the items reflected in the invoices did not actually contain the infringing mark. 425 F. Supp. at 238; see also Deering, Milliken & Co. v. Gilbert, 269 F.2d 191, 193 (2d Cir. 1959) (allowing recovery when defendant was evasive, was "unworthy of belief," and produced no evidence of sales); GTFM, Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 304 (S.D.N.Y. 2002) (awarding damages for sales without style number or date in the record because defendant "systematically obstructed the discovery process").  The only case cited by plaintiff which allowed recovery for sales beyond recorded sales was With Love Designs Inc. v. Dressy Tessy Inc., No. 91-cv-4717 (RPP), 1992 U.S. Dist. LEXIS 15629 (S.D.N.Y. Oct. 9, 1992).  However, there, the defendant admitted that it sold all of the goods in its inventory, contradicting the records.  Id. at *8.

Here, defendants have produced detailed sales records that were kept in the normal course of business, have not been sanctioned for obstructing discovery, and have not admitted to

31

selling any additional inventory.[24]  And as just discussed, the inventory records produced show that, for the SKUs reflected in the inventory data, practically all of the "unaccounted" bottles were accounted for in inventory.  Even if plaintiff had proven that the Sales Reports were incomplete, which it has not, it would still not justify the assumption that every bottle ever produced was sold.  Plaintiff's argument assumes, contrary to any business reality, that companies can perfectly calibrate production to demand and sell all of their inventory.  No matter how hard plaintiff tries, the record simply does not match the narrative it urges.

Therefore, the Court determines that the Sales Reports are the appropriate record of bottles sold and the Court does not award revenues for the so-called "unaccounted for bottles."[25]

### 3. Time Period of Infringing Sales

Even after determining the infringing SKUs and the relevant records of sales, a dispute remains regarding the time period of infringing sales.  Defendants only include sales until July 2018,

---

[24] While plaintiff at one point moved for sanctions, see ECF No. 256, the Court in fact did not impose sanctions, see ECF No. 289 at 176:10-25.

[25] With regards to SKU 15450L, while Ms. Rubin acknowledges that there are no sales, she nonetheless seeks revenues for the produced bottles.  See PX-01/DX02. Consistent with our general ruling to not award revenues for unaccounted for bottles, we do not award any revenue for SKU 15450L.  Further, in this particular case, Ms. Schulz credibly testified as to why bottles of this wine were produced but not sold, namely that it was a "shiner," meaning that it was bottled and not labeled, and thus there was a delay in offering these wines for sale.  DX-54 ¶ 17.

because they maintain the bottles were relabeled and any sales after that date did not include "LIANA" on the bottle.  DX-03 at 15-16.  However, plaintiff argues that this is contradicted by the sales records themselves, which show sales for some infringing SKUs after July 2018.  Pl. Proposed Findings of Fact ¶ 69.  Based on the testimony at trial, the Court finds no contradiction.

During the course of this litigation, defendants eventually ceased selling wines with "LIANA" on the bottle.  In 2018, the wines were either relabeled, dumped back into tanks to be made into Peju or Calmere wines, or dumped into storage tanks to be bottled at a later date.  DX-52 ¶ 23.  As explained through the credible testimony of Ms. Schulz and Mr. Lewin, defendants began the relabeling process first for the Liana Estates Branded Infringing Wines.  Trial Tr. at 273:8-274:5; 681:25-682:13.  The reason for the initial emphasis on the Liana Estates Branded Infringing Wines was that there were more of these infringing wines than Peju Branded ones, and the sales of the Peju Branded Infringing Wines were much slower.  See id. at 273:8-274:5.  Thus, to quickly ensure that no infringing sales would occur, according to Mr. Lewin, defendants began relabeling wines for Liana Estates in May 2018, and finished on July 23, 2018.[26]  DX-52 ¶ 21.

---

[26] During Ms. Schulz's testimony, she stated that the relabeling began in July 2018.  Trial Tr. 273:8-10.  Whether the relabeling began in May or July is not material to the Court's ultimate calculation of profits.

The testimony of Ms. Schulz established that when defendants stopped selling the Liana Estates Branded Infringing Wines, the wines were selected for relabeling or, if not relabeled, were sequestered in defendants' warehouse, put on pallets, shrink-wrapped, and marked with a sign stating "do not sell."  Trial Tr. at 308:19-309:10.    Further, Ms. Schulz testified that she personally checked the bottles in the warehouse in late 2018 to confirm relabeling had, in fact, occurred.[27]  Id.

It is significant for our purposes that after a wine was relabeled, defendants continued to use the same SKU number.  Id. 273:4-7.  Therefore, the system continued to use the same 5-digit identifier even though the bottle no longer contained the word "LIANA" on it.  As such, the Court finds that revenues shown for infringing SKU numbers after July 2018 do not represent sales of Infringing Wines, because they contained a new label that did not use the "LIANA" name.[28]

---

[27] Plaintiff routinely challenged the witness testimony regarding the relabeling process.  While again, the Court found the testimony of Ms. Schulz and Mr. Lewin credible, the Court notes that in 2018 plaintiff had the option to demand inspection of defendants' warehouse to view the relabeled goods under Federal Rule of Civil Procedure 34, but never did so.  Further, plaintiff's arguments that the new labels were not produced is hollow without pointing to a discovery request or a motion to compel seeking that information.  Plaintiff cannot bury its head in the sand and then complain to the Court that it cannot see.

[28] At trial, plaintiff entered into evidence Exhibit PX-22A, which showed revenues for some SKU numbers associated with the Liana Estates Infringing Wines after July 2018.  PX-22A.  Given the credible testimony regarding the relabeling and the fact that defendants continued to use the same SKU after relabeling, the Court dismisses plaintiff's argument that the sales shown by PX-22A after July 2018 for SKU numbers previously associated with infringing wines discredit the validity of the Sales Reports.  The Court also notes that while plaintiff relies on PX-22A to justify its desire to seek revenues for "unaccounted for"

For the wines that were not relabeled at the Liana Estates
Winery, some were dumped into other wine tanks or storage tanks.
DX-52 ¶¶ 23-24.  But, this was not done all at once because there
was limited space and the wine degrades in some of these tanks.
Id.  The trial record contains some limited records showing that
wines were in fact dumped.  See DX-55/DX-54, Ex. K.  In the
meantime, the Peju Branded Infringing Wines were pulled from
inventory and isolated in the warehouse.  Trial Tr. at 272:15-21.
The Peju Branded Infringing Wines were relabeled beginning in 2019.
Id. at 677:14-15.

Ms. Rubin includes in her revenue calculations sales of SKU
15450PP and 14450 after July 2018.  PX-01/DX-02 at 7-11.  For SKU
15450PP, the 2015 Liana Late Harvest Orange Muscat, the record
established that that wine was bottled but never sold with an
infringing label.  DX-52 ¶ 12.  Both the Sales Reports and the
testimony of Mr. Lewin showed that the wine was not sold before
July 2018.  See DX-52 ¶ 12; PX-16/DX-25.  The wine was then
relabeled in December 2019, and the first sale of the wine occurred
on December 10, 2019.  DX-52 ¶¶ 14, 18.  Despite having a new
label, the wine continued to use the same SKU number, 15450PP,
within the system.  See id. ¶¶ 16, 18.

---

bottles, Ms. Rubin did not include the revenues shown in PX-22A in her initial
or rebuttal report.  This contention appeared for the first time on the day of
trial.

However, the record established that the 2014 Liana Late Harvest Orange Muscat, SKU 14450, was not relabeled, and instead a "hold" was placed on the SKU within AMS.  Trial Tr. at 264:5-265:22.  This hold was meant to prevent any additional sales.  DX-53 ¶ 13; DX-52 ¶ 11.  That being said, a Sales Report that included sales of SKU 14450 for the remainder of 2018 showed an additional eight bottles were sold after July 2018, resulting in an additional $104 in revenue.[29]  PX-16/DX-25; DX-33.  Because the testimony established that this wine was not relabeled, the Court finds the eight additional sales of this wine were infringing.

Given the record, the Court awards revenues for the sales of infringing wines as referenced in the Sales Reports until July 2018, with the exception of SKU 14450.  The revenues awarded by SKU are listed in Appendix A.

### 4. Event and Tasting Fees

Finally, the parties disagree regarding the recovery of tasting and event fees earned at the Liana Estates Winery.  In their calculation of revenues, defendants include over $500,000 from events and tastings.  DX-03, Ex. 5.1.  Plaintiff however does not seek these revenues.  PX-02/DX-04 at 9.

---

[29] Eight additional bottles were sold in 2018.  In addition, five bottles were marked in the Sales Report for 2019 and 2020, but there was no revenue associated with those bottles.  See PX-16/DX-25.  According to Ms. Schulz, this represents that a bottle was removed from inventory and "no-charged," which represents the use of the bottle without a sale, like a giveaway.  Trial Tr. at 209:13-20.

The record establishes that between 2014 and July 2018, Liana Estates earned $280,991 in revenues from tasting fees. DX-03, Ex. 5.12. It is the Court's understanding that at tastings, pours of several Liana Estates Branded Wines were given to customers to try for a flat fee. <u>See</u> Trial Tr. at 376:16-20. Tastings included a discussion with a wine educator and sometimes food. <u>Id.</u> at 376:21-377:4, 379:4-8. The record however, does not contain any information regarding which wines or even how many were served in a tasting.

The record also shows that Liana Estates earned $236,348 from "event fees." DX-03, Ex. 5.13. However, even after the four-day trial, it is unclear what was included in these events. Ms. Schulz testified that for the events the "director of experience" works with the guests to craft a menu and selects wines for a flat per person fee. <u>See</u> Trial Tr. at 328:10-329:10. From the record presented, it is unclear how much wine, let alone infringing wine, was served at these events.

Based on the information presented, the Court has no way to determine the percentage of the revenues from tasting or event fees attributable to the Infringing Wines. Further, plaintiff does not actually seek to recover these revenues. Therefore, the Court declines to award revenues for events and tastings.

### 5. Total Sales Awarded

As stated above, the Court finds that the sales shown in the AMS Sales Reports constitute the sales of Infringing Wines prior to July 2018.  The total sales for each infringing SKU are shown in Appendix A.[30]  Overall, the Court finds that there are **$330,002** in bottle sales (wholesale and retail) of the Peju Branded Infringing Wines, and **$732,686** for the Liana Estates Branded Infringing Wines.

In addition to bottle sales, there was testimony that glasses of infringing wine were sold at the Liana Estates Winery.  See Trial Tr. at 324:2-11.  The Court believes for the same reasons that bottle sales are recoverable, so are the by-the-glass pours.  As such, the Court includes the **$8,191** of by-the-glass revenues contained in DX-18, DX-20, DX-22, and DX-29 in its total revenues, as shown in Appendix A.  Therefore, the total revenue from the sale of all Infringing Wines is **$1,070,879**.

### C. Calculation of Costs

Having determined the revenue from the sale of Infringing Wines, the burden shifts to defendants to prove deductible costs.  Not only must defendants prove that they incurred specific costs, they must also prove that the costs were related to the sale of the Infringing Wines.  Manhattan Indus., 885 F.2d at 7.

---

[30] Both experts ultimately agree that deducting the discounts from the gross sales is proper.  Therefore, the Court also deducts the discounts shown in the Sales Reports.

Once again, the parties vastly disagreed on this calculation. In his expert report, Mr. Duski sought to deduct the cost of goods sold, overhead expenses included in P&L statements for the wineries, and excise taxes. See DX-03. Plaintiff challenged each of these, but did not otherwise suggest a more appropriate number. See PX-02/DX-04. The Court evaluates each category of cost below. For the reasons below we award the costs reflected in Appendix B, which include direct costs and excise taxes.

First, defendants seek to deduct $641,018 in direct costs for the wines sold and for the tastings.[31]  DX-03, Ex. 3.0.  For the wine sales, this number is derived from the "cost of goods sold" ("COGS") calculated by defendants' accountants.  Trial Tr. at 562:7-11; DX-03 at 42.

Ms. Schulz and Mr. Duski testified that COGS is a standard accounting principle, typically prepared by accountants, and the best measure of direct costs.  Trial Tr. at 543:2-17; 562:7-11, 570:5-10.  In the wine context, it includes the cost to grow or buy the grapes, bottles, corks, costs related to processing, costs related to storing and aging the wines, and costs related to bottling and labeling the wines.  See id. at 543:2-17; DX-3 at 42-43.

---

[31] Because the Court does not award revenues related to tastings and events, we need not evaluate defendants' calculation of costs related to those events.

Unfortunately, neither side chose to call an accountant specializing in wine as an expert, which would have been helpful in a disgorgement analysis. Nevertheless, the Court found credible the testimony of Ms. Schulz that these calculations were part of routine accounting practice and done in compliance with the accounting standards. Ms. Schulz testified that the cost of goods sold included the grape or bulk wine cost, cellar costs, and bottling costs (i.e., glass, corks, and labels). See Trial Tr. at 543:2-17. It also included an allocation for the square footage of the cellar devoted to these wines.[32] Id. However, the measure excluded costs related to production of future wines. Id. 320:1-18. Additionally, Mr. Duski testified that in using the cost of goods metric, his conversations with Ms. Schulz describing how the number was calculated comported with his understanding of generally accepted accounting practices. Id. at 562:7-11. Originally, the figure was prepared by an external accountant, and then sometime in 2019 or 2020, defendants calculated the cost of goods sold themselves, and that calculation was then reviewed and signed off by an external accounting firm. See Trial Tr. at 543:20-544:19.

---

[32] On his cross examination, Mr. Duski referred to this "indirect" cost as "manufacturing overhead" and testified that it is included in the cost of goods sold under generally accepted accounting principles. Id. at 569:12-23 ("I deducted all the manufacturing overhead because by definition they are tied directly to the sale of the complained of wines otherwise they would not be included as a component of cost of goods sold.").

The record contains the cost of goods sold for the Peju Branded Infringing wines by SKU.  DX-11/DX-49, Ex. I; DX-34.  However, for the Liana Estates Branded Infringing Wines, the cost of goods sold was not produced for each infringing SKU.  See Trial Tr. 544:20-25.  Instead, the aggregated cost of goods sold for all the wines sold at Liana Estates was contained in the P&L Statements.  See DX-13/DX-49, Ex. K; DX-14; DX-30.  These P&L Statements were run monthly and were reviewed by the management team to analyze the performance of the business.  DX-3 at 51.  From this Mr. Duski argues that you can calculate the cost of goods sold for only the infringing wines by multiplying the cost of goods sold in the P&L Statements by the ratio of infringing sales to all sales in each year at Liana Estates.  Id.

Plaintiff however challenges the cost of goods sold as "unexplained."  PX-02/DX-04 at 12.  The Court finds this argument insufficient to challenge the record evidence of the cost of goods sold.  While the underlying formula was not disclosed, both Ms. Schulz and Mr. Duski explained the accounting process used to calculate the cost of goods sold and the categories of costs included.  Id. at 543:2-17, 562:7-11.  Further, plaintiff's comparison to Judge Furman's decision in Coty Inc. v. Excell Brands, LLC, 277 F. Supp. 3d 425 (S.D.N.Y. 2017) misses the point.  Pl. Proposed Findings of Fact ¶¶ 77-80.  While Judge Furman ultimately rejected the cost of goods sold included in P&L

41

statements when calculating infringer's profits, it was not a general attack on this metric or on P&L statements. Instead, Judge Furman believed that the P&L statements themselves were "inaccurate and unreliable," because witnesses admitted that the statements were later revised when reviewed by outside accountants and a sufficient foundation had not been laid. Id. at 466-467. No similar testimony or basis to challenge the P&L Statements exists here.

Second, as discussed previously, the caselaw distinguishes between direct and indirect costs, applying a more stringent standard to recovery of indirect costs. As a result, plaintiff challenges the cost of goods sold used by defendants because it contains some overhead costs in its calculation. See Trial Tr. at 566:11-569:13. However, both Ms. Schulz and Mr. Duski testified that overhead cost included in the cost of goods sold is the allocation for the square footage of the facility used to produce the wine, in compliance with the standard accounting practice and calculated independent of this litigation. Id. at 543:2-17, 569:11-17. The inclusion of this cost does not taint the metric, since this is precisely the type of overhead cost that is recoverable, as it is tied to the production of the infringing product.

Third, plaintiff finds fault with the use of the P&L Statements that aggregate the cost of goods sold for the Liana

Estates Winery.  The Court understands that the cost of goods sold within the Liana Tasting Room P&L Statement[33] is the aggregated amount of the cost of goods metric discussed earlier for all wines. However, the Court has no reason to question the P&L Statements that were generated in the normal course of running the wineries.[34] Therefore, multiplying the total cost of goods sold in the P&L by the percentage of wine sales from Liana Estates Branded Infringing Wines is a sufficient methodology to allocate evidence of direct costs.[35]  Therefore, the direct costs associated with the Liana Estates Branded Infringing Wines are **$374,459**.

Overall, we find that defendant has properly demonstrated a total of **$396,053** in direct costs for all Infringing Wines (Peju Branded and Liana Estates Branded Infringing Wines).

### 1. Overhead Costs

Finally, defendants presented evidence regarding overhead costs.  Mr. Duski argues that we should deduct over $2 million in

---

[33] The P&L Statements refer to "Tasting Rooms," however as noted earlier in footnote 17, the Court believes this refers to the physical wineries. Therefore, for consistency, this P&L refers to the Liana Estates Winery.

[34] Throughout the trial, plaintiff questioned the validity of the P&L Statements by arguing they must have been produced for this litigation as defendants include both wineries under PFOP when reporting taxes.  Plaintiff fundamentally misunderstands the difference between business documents created for tax purposes and those created to operate a business.  Testimony established that defendants collect revenues, costs, and profits at each winery which are then rolled up into a single entity for taxes.  Trial Tr. at 335:16-336: 17.  There is nothing nefarious in monitoring the business at a more granular level than is required for tax reporting.

[35] This is particularly appropriate because the vast majority of wine sales were infringing.  See Appendix B.

overhead costs.  DX-03, Ex. 3.0.  To calculate this figure for the Peju Winery, Mr. Duski relied on the costs in a 2017 P&L Statement for the Peju Tasting Room, and then followed the guidance of Ms. Schulz to allocate 20 percent and 50 percent of the net sales for "Fixed Admin Benefits" and "Tasting Room Costs," respectively. DX-3 at 46-48, Exhibit 4.2.  In calculating the "Fixed Admin Benefits," there was no testimony regarding the type of employees included, their role in the company, and their connection to the Infringing Wines.  Similarly, Mr. Duski largely regurgitated Ms. Schulz's analysis to calculate the "Tasting Room Costs" without providing further explanation linking the costs and the infringing products.  See DX-3, Exhibit 4.2, ns. 2, 3, 5,

Defendants adopted a different approach for the Liana Estates Winery.  Here, Mr. Duski attempted to deduct practically every line item on the P&L Statements for the Liana Estates Winery.  This included categories such as "Salaries and Wages" and "Supplies," as well as more nebulous categories like "General Expenses," "Outside Serv / Consulting Fees," and "Travel and Entertainment." See DX-3, Exhibit 5.14.  However, there was no additional explanation provided for these categories, and when questioned in Court, Mr. Duski at times was unaware of what was captured by the categories.  See Trial Tr. at 615:9-14 ("Q:  Do you know what the outside service and consulting fees include? A:  As I sit here right now, I don't have an exact definition for you.  I do know

44

that they are directly attributable to the Liana brand or else they would not have appeared on this profit and loss statement.")

Plaintiff challenges the overhead costs as not sufficiently related to the Infringing Wines, and the Court agrees.  Mr. Duski has failed to link any of the overhead cost categories to the production of the Infringing Wines and at times could not explain what was captured by the specific cost categories.

Simply, there is an insufficient nexus between the overhead costs and the infringing goods.  Use of broad categories which are not described "beyond a one- or two-word label . . . make it impossible for the court -- even if we disregarded defendant's burden of proof – to determine the nature of the linkage of the cost category to the sale of [infringing] goods."  Fendi, 642 F. Supp. 2d at 293.  This problem is even more serious here; since the Court has already found the infringement to be willful, the caselaw requires the Court to be more discerning when deciding whether to award overhead costs.  Hamil, 193 F.3d at 107. Defendants have failed to meet their burden on the first step of the overhead cost analysis.  Thus, the Court need not analyze whether the allocation methodology was proper.

### 2. Excise Taxes

Finally, defendants maintain that they should be permitted to deduct excise taxes.  Mr. Duski noted in his analysis that California imposes an excise tax on the sale of beer and wine.

45

DX-3 at 52.  As such, the excise taxes are directly related to the sale of the infringing wine.  The excise taxes are reported for the Liana Estates Winery in its P&L Statement.  Id.  Using the same methodology as Mr. Duski, the Court allocates a portion of those excise taxes to the sales of Infringing Wines and tasting fee revenue, as shown in Appendix B.  Overall, the Court finds defendants paid **$8,612** in excise taxes on the infringing wine sales.

While federal income tax is often not deducted in disgorgement analyses, the Court has the discretion to deduct excise taxes.  5 McCarthy on Trademarks § 30:67 (5th ed.).  The tax here is a state tax that is levied on the sale of the exact infringing products at issue.  Thus, the Court holds it is proper to deduct the excise taxes related to the sale of Infringing Wines.

### D. Profits and Equitable Adjustments

Given the findings above, we award plaintiff a total of **$666,214** in profits, as shown in Appendix C.

Defendants then urge the Court to make an equitable adjustment to the award of profits to further reduce the award.  Def. Proposed Findings of Fact ¶ 139, ECF No. 469.  The Lanham Act permits an equitable adjustment "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive" and thus "the court may in its discretion enter judgment for such sum as the court shall find just, according to the circumstances

of the case."  15 U.S.C. § 1117(a).  Defendants argue that because "there is no evidence in the record of actual confusion," the Court should decrease the award.  Def. Proposed Findings of Fact ¶ 139. However, the Court in evaluating the award in its equity power can also consider the actions of defendants, including that they continued to sell the Infringing Wines after receiving a cease-and-desist letter and after the initiation of this lawsuit, which resulted in our finding of bad faith in response to a motion for summary judgment.  See supra at 6-7, 12-14; ECF No. 372 at 37-39. With that in mind, the Court finds that the award of **$666,214** is not excessive and declines to make any equitable adjustment.

**CONCLUSION**

For the reasons stated above, the Court awards profits in the amount of **$666,214**.

It is hereby ordered that the deadline for plaintiff to file a motion for attorneys' fees and costs, if any, is October 20, 2023.  That application shall include: (i) caselaw support for plaintiff's application demonstrating that this action is an exceptional case; (ii) a sworn declaration providing each attorney and legal support staff's background, experience, and billing rate at the time the work was expended; (iii) copies of contemporaneous time sheets that include the date, hours expended, and nature of work completed, specifically noting the filings or motions that were worked on in that entry; (iv) a chart aggregating the fees

47

and costs sought by plaintiff to each stage of the litigation
(e.g., particular motions, letters, deposition preparation,
depositions taken, court appearances and related preparation,
etc.); (v) a chart describing any costs sought by plaintiff; and
(vi) a chart detailing the attorneys' fees and costs already paid
by plaintiff and those outstanding as of the date of the
submission.[36]  If necessary, the deadline for defendant to file an
opposition to plaintiff's motion is October 20, 2023.

**SO ORDERED.**

Dated:     New York, New York
           September 22, 2023

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

---

[36] The Court reminds the parties that under Section 35(a) of the Lanham Act, a
court "in exceptional cases may award reasonable attorney fees to the prevailing
party." 15 U.S.C. § 1117(a).  The Court reviews these submissions to ensure
that the attorney's fees hours are not "excessive, redundant, or otherwise
unnecessary." Hensley v. Eckerhart, 461 U.S. 424, 433-34 (1983).

Additionally, in its post-trial submission, plaintiff noted that it would also
seek interest under 15 U.S.C. 1117(a). Pl. Post-Trial Memorandum at 1 n.2, ECF
No. 470.  Similarly, "Section 1117(a) does not provide for prejudgment
interest," but "such an award is within the discretion of the trial Court" and
is "reserved for 'exceptional' cases." Am. Honda, 918 F.2d at 1064. It is far
from clear that prejudgment interest is warranted in this case.

## Appendix A: Sales

| SKU | Wine | Gross Sales | Discount | Net Sales | Source |
|---|---|---|---|---|---|
| **PEJU PROVINCE WINERY WINES** | | | | | |
| 13450 | 2013 Liana North Coast Orange Muscat | $208,665 | $6,140 | $202,525 | PX-16/DX-25; DX-33 |
| 14450 | 2014 Liana North Coast Orange Muscat | $133,326 | $5,849 | $127,477 | PX-16/DX-25; DX-33 |
| 15450PP | 2015 Liana Late Harvest | No revenues awarded | | | |
| **LIANA ESTATES WINES (Retail and Wholesale)** | | | | | |
| 14231 | 2014 Pinot Noir NV | $193,712 | $29,962 | $163,750 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 14691 | 2014 Vintner's Red | $59,750 | $14,119 | $45,631 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 14801L | 2014 Sparking RO | No revenues awarded | | | |
| 14811L | 2014 Sparkling Bru | No revenues awarded | | | |
| 14281L | 2014 Blanc de Blanc | No revenues awarded | | | |
| 15071L | 2015 Chardonnay N | $92,372 | $19,838 | $72,534 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15101L | 2015 Vintners Pink | $0 | $0 | $0 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15101LSE | 2015 Vintners | $6,358 | $1,217 | $5,141 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15101LTR | 2015 Vintners | $33,291 | $5,573 | $27,718 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15651 | 2015 Orange Muscat Dry | $0 | $0 | $0 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15651SE | 2015 Orange Muscat | $29,036 | $3,189 | $25,847 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15651TR | 2015 Orange Muscat | $34,238 | $3,731 | $30,507 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15671 | 2015 Viognier Mendocino | $0 | $0 | $0 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15671SE | 2015 Viognier - S | $14,816 | $2,162 | $12,654 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15671TR | 2015 Viognier - T | $28,103 | $3,810 | $24,293 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15681 | 2015 Vintners White Blend | $0 | $0 | $0 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15681SE | 2015 Vintners W | $62,804 | $14,397 | $48,407 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 15681TR | 2015 Vintners W | $82,013 | $18,133 | $63,880 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |

## Appendix A: Sales

| SKU | Wine | Gross Sales | Discount | Net Sales | Source |
|---|---|---|---|---|---|
| 15691 | 2015 Vintners Red | $25,538 | $3,527 | $22,011 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 16101L | 2016 Vintners Pink NV | $0 | $0 | $0 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 16331L | 2016 Rose of Pinto | $29,216 | $3,481 | $25,735 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 16431L | 2016 Riesling No | $14,720 | $1,682 | $13,038 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 16651L | 2016 Orange Muscat | $204 | $0 | $204 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| 16671L | 2016 Viognier Mendocino | $0 | $0 | $0 | PX-10/DX-18; PX-12/DX-20; PX-14/DX-22; DX-29 |
| | 2014 Pinot Noir NV | $43,320 | $0 | $43,320 | PX-11/DX-10; PX-13/DX-21; PX-15/DX-24; DX-31 |
| | 2014 Vintners Red Blend | $78,630 | $0 | $78,630 | PX-11/DX-10; PX-13/DX-21; PX-15/DX-24; DX-31 |
| | 2015 Chardonnay NV Peju | $1,280 | $0 | $1,280 | PX-11/DX-10; PX-13/DX-21; PX-15/DX-24; DX-31 |
| | 2015 Vintners Pink - TR | $528 | $0 | $528 | PX-11/DX-10; PX-13/DX-21; PX-15/DX-24; DX-31 |
| | 2015 Vintners White TR Only | $24,372 | $0 | $24,372 | PX-11/DX-10; PX-13/DX-21; PX-15/DX-24; DX-31 |
| | 2015 Vintners White -SH/DE | $3,408 | $202 | $3,206 | PX-11/DX-10; PX-13/DX-21; PX-15/DX-24; DX-31 |
| **BY THE GLASS POURS LIANA ESTATES** | | | | | |
| BTG-CHL | BTG Chardonnay | $1,486 | $0 | $1,486 | DX-18; DX-20; DX-22; DX-29 |
| BTG-MISCL | BTG - Misc Liana | $16 | $0 | $16 | DX-18; DX-20; DX-22; DX-29 |
| BTG-OM | BTG - Orange Muscat | $576 | $0 | $576 | DX-18; DX-20; DX-22; DX-29 |
| BTG-PN | BTG - Pinot Noir | $2,676 | $0 | $2,676 | DX-18; DX-20; DX-22; DX-29 |
| BTG-VP | BTG - Vintners Pink | $485 | $0 | $485 | DX-18; DX-20; DX-22; DX-29 |
| BTG-VI | BTG - Viognier | $552 | $0 | $552 | DX-18; DX-20; DX-22; DX-29 |
| BTG-VR | BTG - Vintners Red | $1,230 | $0 | $1,230 | DX-18; DX-20; DX-22; DX-29 |
| BTG-VW | BTG - Vintner's White | $1,170 | $0 | $1,170 | DX-18; DX-20; DX-22; DX-29 |
| **Total Peju Branded Infringing Wine Revenue** | | **$341,881** | **$11,984** | **$330,002** | |
| **Total Liana Estates Branded Infringing Wine Revenue** | | **$857,709** | **$125,023** | **$732,686** | |
| **Total Liana Estates Branded Infringing Wine By-the-Glass Revenue** | | **$8,191** | **$0** | **$8,191** | |
| **Total Revenues** | | | | **$1,070,879** | |

## Appendix B: Costs

**Peju Branded Infringing Wine**

**Cost of Goods Sold**

| SKU | 2014 | 2015 | 2016 | 2017 | 2018 | Total | Source |
|---|---|---|---|---|---|---|---|
| 13450 | $3,167 | $8,591 | $1,298 | $9 | $0 | $13,065 | *DX-11; DX-34* |
| 14450 | $0 | $41 | $3,536 | $3,559 | $1,393 | $8,529 | *DX-11; DX-34* |
| **Total** | **$3,167** | **$8,632** | **$4,834** | **$3,568** | **$1,393** | **$21,594** | |

**Liana Estates Branded Infringing Wines**

**Cost of Goods Sold (Bottles and By-the-Glass Sales)**

| | 2016 | 2017 | 2018 | Total | Source |
|---|---|---|---|---|---|
| Cost of Wine in P&L [a] | $259,367 | $174,435 | $85,416 | $519,218 | *DX-13; DX-14; DX-30* |
| All Wine Revenues in P&L [b] | $252,254* | $564,203 | $357,784 | $1,174,241 | *DX-03, Ex. 5.14; DX-13; DX-14; DX-30* |
| Infringing Wine Net Revenues [c] | $221,769 | $319,533 | $199,576 | $740,878 | |
| Percentage of Wine Sales from Infringing Wines ([d]=[c]/[b]) | 87.91% | 56.63% | 55.78% | | |
| **Total Costs for Infringing Wines ([d] x [a])** | **$228,022** | **$98,790** | **$47,646** | **$374,459** | |

*The Court found credible the testimony of Mr. Duski that there was an incorrect debit from retail wine sales for $49,760.  DX-03, Ex. 5.14; Trial Tr. at 604:10-605-14.  We include the same adjustment in our calculation.

**Excise Taxes**

| | 2016 | 2017 | 2018 | Total | Source |
|---|---|---|---|---|---|
| Excise Taxes [g] | $6,853 | $2,558 | $2,041 | $11,452 | *DX-13; DX-14; DX-30* |
| **Allocation of Excise Taxes to Bottle Sales [g] x [d]** | **$6,025** | **$1,449** | **$1,138** | **$8,612** | |

## Appendix C: Profits

| | Peju-Branded Wines | Liana-Branded Wines (including By-the-Glass Sales) | Total |
|---|---|---|---|
| Revenues | $330,002 | $740,877 | $1,070,879 |
| Cost of Goods Sold | $21,594 | $374,459 | $396,053 |
| Excise Taxes | $0 | $8,612 | $8,612 |
| Operating Costs | $0 | $0 | $0 |
| **Profits** | **$308,408** | **$357,806** | **$666,214** |